IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2020

**STATE OF TENNESSEE v. ZACHARY THOMPSON**

**Appeal from the Criminal Court for Shelby County**
No. 17-01165        Paula L. Skahan, Judge
_____

**No. W2019-00023-CCA-R3-CD**
_____

Defendant, Zachary Thompson, was found guilty of first-degree premeditated murder and was sentenced to life imprisonment. On appeal, Defendant argues that the trial court erred by not instructing the jury on self-defense and that the evidence was insufficient to support his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Zachary Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Katherine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

On the morning of August 29, 2016, Freddie Thomas heard gunshots as he drove down Hawkins Mill Road in Memphis. He looked over toward the Hawkins Mill Market and saw the victim, Anthony Pope, "jump" or "twist" from being shot and then running toward the market's door. Mr. Thomas also saw the shooter, who looked familiar to him. He noted that the shooter "wasn't playing" and that he "aimed to shoot." Mr. Thomas saw a police car at a nearby traffic light, and he flagged the officer down and told him about the shooting. He gave a description of the shooter to the officer, and he also saw what he thought was the shooter's vehicle drive past them. Mr. Thomas testified that the

vehicle was traveling "just slowly but surely . . . like ain't nothing happened." Mr. Thomas followed the officer back to the market, and he walked inside to look for the victim. Mr. Thomas found the victim in the third aisle of the market, and the victim said that Defendant had shot him. The victim was able to talk even though he was bleeding from his chest. Mr. Thomas testified that the victim also told the responding officers that Defendant shot him.

Officer Dwayne Nesbit of the Memphis Police Department testified that he drove to the Hawkins Mill Market after being approached by Mr. Thomas who informed him of the shooting. When he arrived at the market, he saw the victim in the parking lot with a gunshot wound to his chest. The victim then got up, closed the door to a white car, and staggered into the market. Officer Nesbit remained outside while other officers who had arrived on the scene went inside the market and talked to the victim. He said that two men at the scene said that they saw a weapon and that it was in one of the cars there. Officers Rob Wiggins and Alphonzo Jenkins of the Memphis Police Department testified that they found the victim inside the Hawkins Mill Market, and he told them that Defendant shot him. The victim was taken to the hospital and later died from the gunshot wound to his chest. Dr. Marco Ross testified that there was an entrance wound to the right outer portion of the victim's chest and an exit wound to the left front portion of his chest.

Mohamed Aziz was working at the Hawkins Hill Market when the shooting occurred. He said that the victim was a regular customer, and there was nothing unusual about his transaction with the victim that morning. The market's surveillance video, which Mr. Aziz gave to police, showed that the victim walked in the market at approximately 8:49 a.m. The victim purchased some items, received his change, and opened the front door to leave the market. Mr. Aziz then heard gunshots. He testified that he did not see the victim in possession of a gun until after the victim was shot and re-entered the market.

Detective James Smith of the Memphis Police Department, Homicide Division, testified that he investigated the victim's murder. He said that Defendant had already been identified as the suspect when he was assigned the case. Detective Smith interviewed Defendant the following day, August 30, 2016, with his attorney present. Defendant admitted that he was responsible for the victim's death. He knew the victim through Defendant's ex-girlfriend, Nakisha Reed. Defendant said that he had previously been threatened by the victim through Facebook. When asked why he was at the Hawkins Mill Market on August 29, 2016, Defendant said:

> I was looking for Nakisha Reed to question her about a note left on my baby's momma's car, and a flat tire on her car. After calling her several times, I drove to her house but she wasn't there. I spoke with her on the way back to my house. She said she was at her job off Shelby Dr. I

- 2 -

asked her about what job so she lied and I said don't even worry about it. I proceeded to the house and seen her car at the store . . . I pulled behind her car and proceeded to walk in the store to talk to her. [The victim] was walking out [of] the store and he said, "What's up bitch?" and he reached for a weapon and shot, and I shot back at him three times. I hopped in the vehicle and left the scene and went to [Shanterrica White's] house on Mitch St.

Defendant told Detective Smith that he armed himself when he got out of his car at the market because he "didn't feel safe around [Ms. Reed] anymore." Although Defendant claimed that he acted in self-defense, he said that he was afraid to call police after the shooting. When asked if he chased the victim while shooting at him, Defendant replied: "I stepped up and shot." He denied pursuing the victim into the market. Defendant said that he did not see a gun in the victim's hand as he walked out of the store but the victim "revealed the gun and let a shot off." Defendant said that the victim pointed his gun at Defendant almost immediately after saying, "Bitch what's up," and he thought that the victim was shooting at him when the victim pulled the gun. When asked why he thought that, Defendant responded that it was because the victim had already said what he was going to do to Defendant. He concluded his statement by saying: "This is a situation where no harm was really intended. I just wanted to talk to Nakisha [Reed]. I'm truly sorry I took someone's life. I acted out of self-defense." Defendant told police that his gun was at Ms. White's house. A Beretta .40 caliber semi-automatic pistol along with an empty magazine was later recovered from underneath the mattress in Ms. White's bedroom.

Detective Smith received the surveillance video from the Hawkins Hill Market and reviewed it. The surveillance video, which depicted several angles of both the inside and the outside of the market, showed that Defendant pulled into the Hawkins Mill Market parking lot at approximately 8:50 a.m. and blocked in the white car that the victim had driven there. Defendant got out of the vehicle with a gun in his hand, by his right side, and he raised the gun as he approached the store. Detective Smith testified that the victim left the market with a plastic bag in one hand and what appeared to be a cell phone in his other hand. It also appeared that the victim was in the process of placing the cell phone in his pocket and bringing his hand back up when he was shot by Defendant as the victim walked out of the market. Detective Smith testified that the victim did not fire a shot or have a gun in his hand as he left the market, which contradicted Defendant's claim of self-defense. The victim re-entered the market after he was shot, fell down, and retreated to the back of the market. Defendant pursued the victim as the victim ran back into the market, and Defendant pointed his gun inside the door. Detective Smith testified that the video showed both of the victim's hands when he fell down, and the victim did not have a gun in his hands

- 3 -

at the time. Detective Smith testified that the video showed that the victim had a gun in his hand once he retreated back into the market, and the victim fired one shot. The victim left the market after being shot and walked over to a silver car with two individuals sitting inside. He then walked over to the white car that he had driven to the market, placed something inside the car and took some items out, and walked back inside the market. Detective Smith testified that a Glock .40 caliber semi-automatic pistol with a bullet in the chamber and shell casings were collected from the scene. The gun was found inside the white car. A back-pack containing a magazine clip with thirteen rounds was also recovered from the scene. One shell casing was found in the back of the market in the area where the victim was located. There were several shell casings located outside of the market and one just inside the door.

Shanterrica White testified that Defendant is her child's father, and she spent the night before the victim's murder at his house where he lived with his mother. Ms. White said that Defendant left the house sometime that morning and then returned. He left the house again thirty to forty-five minutes later. Ms. White testified that Defendant later called and told her to leave the house, and he said: "I think I shot somebody." Ms. White drove to her mother's house on Mitch Street. Defendant came to the house later and told Ms. White what happened. After Defendant was taken into custody, he called Ms. White and told her that he had put the gun used in the shooting in her bedroom.

Nakisha Reed testified that the victim is her daughter's father, and Ms. Reed and the victim were dating at the time of his death. She and Defendant worked together, and they had previously dated for approximately one month. Ms. Reed testified that the victim had spent the night at her apartment and left the morning of the shooting sometime around 9:00 a.m. She said that the victim was driving her car and said that he was going to his mother's house. Ms. Reed testified that Defendant called her several times that morning while the victim was still at her apartment. Ms. Reed answered the phone one time, and Defendant asked if she and the victim were back together and if she had shot his girlfriend's car. Defendant also told her that the victim had sent him a video of her and the victim having sex. Ms. Reed said that she told Defendant that she and the victim were back together and that it was none of Defendant's business. She noted that the victim left her apartment approximately five to ten minutes after she spoke to Defendant.

Ms. Reed testified that approximately one and a half hours after the victim's murder, she texted Defendant and asked if he shot the victim. Defendant initially replied: "Dam [the victim] got shoot [sic]?????" After that he texted: "What [are] [you] talking about I shoot dude!!! Quit text[ing] my phone with that foolishness" and "[You] ain't bout to put that [expletive] on me!" Ms.

- 4 -

Reed also testified that Defendant called her while she was on her way to the murder scene and said he knew she was not in her car. Ms. Reed testified that she was aware that the victim and Defendant each carried a gun.

Ms. Reed testified that approximately two weeks before the victim's murder, the victim and Defendant were "going back and forth" about her. Evidence was introduced at trial of a Facebook conversation between Defendant and the victim. In the conversation, Defendant told the victim that he knew where the victim lived. Defendant also sent the victim a picture of the victim's house. The victim responded: "Come on watch [you] meet [your] maker [I know] were [you] stay homie [you] a bitch." The victim also sent a picture of ammunition with a message that read: "Pull since you know where I stay." Ms. Reed testified that this meant for Defendant to come to the victim's house.

Ms. Reed testified that she was at Defendant's house around midnight on August 15, 2016, and she heard gunshots and saw a car drive by. Defendant called police to the scene and told them about the picture of ammunition the victim had previously sent him, which was the same brand as the shell casings found at his house after the shooting. Defendant also informed them about the conflict between himself and the victim. Officer James Johnson testified that Defendant gave him three shell casings that Defendant said he found across the street. All three of the casings were TulAmmo brand. One casing was .40 caliber and the other two were .380 caliber.

Detective Brian Vincent of the Memphis Police Department testified he spoke with Defendant about the shooting at his house. Defendant initially wanted to prosecute the victim for sending the Facebook messages and the shooting. However, he changed his mind after he was asked to come to the police station and make a statement and show all of the Facebook messages. Defendant refused to give a statement, and he signed a "refusal to prosecute" form. He also said, "I ain't going to put nobody in jail that don't need to be in jail." Detective Vincent testified that he was unable to prove that the victim perpetrated the shooting at Defendant's house.

Kasia Lynch of the Tennessee Bureau of Investigation Crime Lab, Firearms Identification Unit, testified that she examined the shell casings recovered from the shooting at the Hawkins Mill Market and the shell casings that Defendant gave officers from the shooting at his house on August 15, 2016. Agent Lynch also examined a .40 caliber Smith and Wesson pistol manufactured by Beretta recovered from the residence on Mitch Street and a .40 caliber Glock pistol recovered from a car at the murder scene. Agent Lynch testified that of the four shell casings recovered from murder scene, one of them was fired from the .40 caliber Glock pistol. The three other casings were consistent with being fired

from the .40 caliber Beretta. Agent Lynch testified that the two .380 and one .40 caliber shell casings found after the shooting at Defendant's house were not fired from either weapon found at the murder scene.

*Analysis*

## I.      Jury Instruction on Self-Defense

Defendant argues that the trial court erred by denying his request for a jury instruction on self-defense. The State asserts that self-defense was not fairly raised by the evidence. We agree with the State.

A trial court has a duty to provide a "complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial." *State v. Anderson*, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). "A trial court's refusal to grant a special instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). Erroneous jury instructions "are generally subject to a 'harmless error' analysis" unless they "mislead the jury as to the applicable law or fail to 'fairly submit' the relevant legal issues, such as available defenses." *Id.* at 128 (citing *State v. Williams*, 977 S.W.2d 101, 104-05 (Tenn. 1998); *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

A defendant is entitled to an instruction on self-defense if it is fairly raised by the evidence. *Myers v. State*, 206 S.W.2d 30, 32 (Tenn. 1947). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. If the defense is fairly raised by the admissible evidence, "the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply," *id.*, and the issue of whether a defendant acted in self-defense becomes a factual determination to be made by the jury, *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). However, "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c).

Tennessee Code Annotated section 39-11-611(b) provides that:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b). This belief must "meet an objective standard of reasonableness to be justified," and "the mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998).

Recently, in *State v. Antonio Benson*, ___ S.W.3d ___, No. W2017-01119-SC-R11-CD, 2020 WL 2079055, (Tenn., April 30, 2020), the Tennessee Supreme Court considered and clarified the trial court's role as "gatekeeper" when assessing whether self-defense has been fairly raised by the proof.

> In *State v. Perrier*, this Court addressed the question of whether the trial court or the jury should make the threshold determination of whether or not a defendant was engaged in unlawful activity for purposes of the retreat component of the self-defense statute, Tennessee Code Annotated section 39-11-611. [*State v.*]*Perrier*, 536 S.W.3d [388, 394 (Tenn. 2017)]. We held that the trial court, not the jury, should determine whether the State's proof established clear and convincing evidence that the defendant was engaged in unlawful activity when he used force in an alleged self-defense situation. *Id.* at 403. We held that the trial court's jury instruction was, therefore, improper because the instructions left the determination of unlawful activity to the jury. *Id.* at 403-04.

*Antonio Benson*, 2020 WL 2079055, at *5. The supreme court rejected the defendant's proposal that the court adopt the approach that would consider self-defense "fairly raised"

if a defendant can "point to even 'the slightest' evidence of self-defense." *Id.* at \*6. Concerning the definition of "fairly raised," the supreme court further opined:

> Although the phrase "fairly raised" is not defined by statute, it has been the standard relevant to raising a general defense in Tennessee for decades. In [*State v.*]*Hawkins*, [406 S.W.3d 121 (Tenn. 2013)], this Court held:
>
>> A general defense . . . need not be submitted to the jury unless it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) (2010). The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury. From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply.
>
> *Hawkins*, 406 S.W.3d at 129 (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)).

*Antonio Benson*, 2020 WL, at \*6.

In *Antonio Benson*, the defendant claimed that he acted in self-defense when he shot the unarmed victim five times for punching him in the nose after he had demanded oral sex from her several times and had grabbed the back of her head. He claimed that the victim was "high on drugs, seeking more drugs, was the first aggressor in a violent and sudden attack, with enough force to disfigure the defendant's face, was unfazed by initial shots, and continued to fight from inside the house to outside the house." *Antonio Benson*, 2020 WL 2079055, at \*7. The supreme court noted that there was nothing in Defendant's statement to police to fairly raise the issue of self-defense in that Defendant feared imminent death or serious bodily injury. The supreme court found:

> At most, the defense proof fairly raised the issue of whether the defendant was justified in using *non-lethal* force to protect himself from the victim. The defendant here, however, is not attempting to justify a simple assault against the victim. Instead, he chose to respond to a punch in the nose by pulling out a gun and shooting a small, unarmed woman five times, including twice in the back. As the trial court recognized, "[t]here's absolutely nothing . . . that would allow a jury to conclude that

this defendant had [   ] reasonable grounds to fear imminent bodily injury – serious bodily injury or death.

*Antonio Benson*, 2020 WL 2079055, at *7-8.

In the present case, the trial court in essence found that self-defense was not "fairly raised" by the proof. Concerning this issue, the trial court made the following findings:

I have a very hard time seeing this as self-defense. We are very fortunate to have video from almost every angle at this [convenience store]. It's really amazing. I've never seen this much video in a case like this. But it shows [the victim] . . . purchasing his things and walking out. He was on a phone call. He's holding his phone in one hand. He's got his things that he's carrying in his other hand. He's going out, he's going to his car and not really paying attention to anything else and he's immediately fired upon.

We see [Defendant] . . . had come into the parking lot, had blocked the white vehicle that [the victim] . . . had driven to the store in. Gets out of the vehicle with his gun down by his, in his right hand by his side. As he sees [the victim] come out of the store he immediately raises it up, it did not appear to be in his pocket. It was possible that he immediately raises it up and starts firing at [the victim]. Continues, he goes around the vehicle and continues firing at him and even into the store as [the victim] opens the store [sic] and goes for cover.

I just don't see any way this was self-defense. [The victim] did not have the gun in his hand. I just – even though there may have been threats earlier between the two of them. Even though . . . [Defendant's] house may have been fired upon days earlier, in this particular instance there was no provocation. There's absolutely no gun, no threat at [Defendant].

The trial court did not err by refusing to charge the jury on self-defense. Defendant's statement to police that the victim said, "What's up bitch?" and then reached for a weapon and fired a shot is the only evidence suggesting that Defendant needed to act in self-defense. However, Defendant already had a gun in his hand before the victim exited the market. The surveillance video from the Hawkins Mill Market, which included several angles from both inside and outside of the market, completely belies Defendant's self-defense claim. Defendant got out of his vehicle with a gun down to his side after blocking in the car that the victim drove to the store. The victim clearly walked out of the store unaware of Defendant's presence until Defendant immediately ran up and shot him. As pointed out by Detective Smith, the victim did not have a gun in his hand

- 9 -

until after Defendant shot him, and he had retreated to the back of the store. The victim did not fire a shot until after Defendant shot at the victim three times and clearly chased the victim back into the store. The video shows that Defendant pointed his weapon into the store after shooting the victim. Although there had been conflict and previous threats by both the victim and Defendant, there was no evidence that the victim did anything to threaten Defendant on the day of the shooting.

The evidence viewed in a light most favorable to Defendant, including all reasonable inferences that can be drawn therefrom, does not fairly raise the issue of self-defense. There was nothing to show that Defendant reasonably feared imminent death or serious bodily injury as to justify his use of deadly force. The trial court found that the extensive surveillance video captured the entire criminal act from beginning to end. The content of the video itself is not subject to a credibility determination. It is what it is. The trial court was absolutely correct under the circumstances of this case to conclude there was not "any way this was self-defense." Defendant is not entitled to relief on this issue.

## II.      *Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to support his conviction for first-degree murder because the evidence did not show that he acted with premeditation when he shot and killed the victim. The State responds that the evidence presented was sufficient to sustain Defendant's conviction. We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005); *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)

(quoting *Hanson*, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)).

First degree murder is defined as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

T.C.A. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *Bland*, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. *See State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004) (citing *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998) ).

We conclude that the evidence viewed in the light most favorable to the State proves that the killing in this case was premeditated. In the days prior to the shooting,

Defendant and the victim had been feuding over the victim's relationship with Ms. Reed, who was Defendant's ex-girlfriend, and the victim had sent Defendant a video of the victim and Ms. Reed having sex. There had also been a Facebook conversation during which Defendant told the victim that he knew where the victim lived, and he also sent a picture of the victim's house. The victim responded: "Come on watch [you] meet [your] maker [I know] were [you] stay homie [you] a bitch." The victim also sent a picture of some ammunition with a message that read: "Pull since you know where I stay." This meant for Defendant to come to the victim's house. Defendant had also claimed that the victim shot at his house approximately two weeks before the murder.

Defendant called Ms. Reed several times the morning of the murder, while the victim was still at her house, and asked her if she and the victim were back together. The victim later drove to the Hawkins Mill Market in Ms. Reed's car, and while he was inside the store, Defendant pulled into the parking lot and blocked in Ms. Reed's car. The jury could have inferred from the evidence that Defendant knew that the victim was driving Ms. Reed's car as Defendant called Ms. Reed and asked if she was driving her car that morning, and he told her he knew that she was not in her car. The surveillance video shows that Defendant got out of his vehicle with a gun down to his side, and he immediately raised the weapon and began firing at the victim as the victim walked out of the market. The video shows that the victim left the store with his cell phone in one hand and a bag in the other hand. Although the victim apparently had a gun on his person, it was not in his hand at the time that he was shot. From the video, it appeared that the victim was in the process of placing his cell phone in his pocket and bringing his hand back up when he was shot by Defendant. Mr. Thompson, who was driving by the market at the time of the shooting, testified that he saw the victim "jump" or "twist" from being shot and run toward the market. He further testified that Defendant "wasn't playing" and "aimed to shoot." Defendant fired three shots at the victim, one of which struck him in the chest. Defendant pursued the victim as he retreated back into the store, stopping at the front door and pointing his weapon inside the store.

At no point did Defendant attempt to render aid to the victim after shooting him. Instead, he drove away from the scene. Mr. Thompson testified that he saw what he thought was Defendant's vehicle drive past him and Officer Nesbit at the traffic light and that the vehicle was traveling "just slowly but surely . . . like ain't nothing happened." Defendant acted surprised and denied shooting the victim when Ms. Reed texted him and asked if he was responsible for the victim's death. Defendant called Shanterrica White after the shooting and told her to leave his house, and he said: "I think I shot somebody." Defendant met Ms. White at her mother's house where he told her what happened and hid the gun in her bedroom under the mattress. From these facts, a jury could conclude beyond a reasonable doubt that Defendant acted with premeditation when he shot and killed the victim.

The proof is sufficient beyond a reasonable doubt to support Defendant's conviction for premeditated first degree murder. Therefore, Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE